IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALAN WU ) | |
|        **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | Case No. |
| ) | Honorable Judge |
| SOUTHERN CROSS RESOURCES ) | |
| GROUP, INC., MICHAEL A. NASATIR, ) | |
| ANDREW L. MADENBERG, ) | |
| ROBIN NASATIR ) | |
| JEFFERY POZEN, AND ) | |
| THOMAS KALLIES ) | |
| ) | |
|        **Defendants.** ) | |

## COMPLAINT

Plaintiff ALAN WU ("Plaintiff") brings forth the following cause of action and allegations against SOUTHERN CROSS RESOURCE, GROUP, INC., (hereinafter referred to as "Southern Cross"), MICHAEL A. NASATIR, ANDREW L. MADENBERG, ROBIN NASATIR, JEFFERY POZEN, AND TOM KALLIES, as individuals (individuals herein collectively referred to as "Individual Defendants"), and states the following:

## INTRODUCTION

1. From the years 2012 to 2016, Michael Nasatir ("Michael") and Andrew L. Madenberg ("Madenberg") owned and operated Southern Cross a company focused on energy-producing assets. Robin Nasatir ("Robin"), Michael's wife acted as Southern Cross's operations manager and was extensively involved in daily business decisions. Thomas Kallies ("Kallies") was the in-house legal counsel for Southern Cross. Beginning 2013 until approximately December 2014, Jeffery Pozen ("Pozen") was the chief financial officer of Southern Cross.

1

2. At all relevant time periods, Michael, Robin, and Madenberg operated Southern Cross through a pattern of fraudulent and racketeering activity defrauding many individuals including Plaintiff out of millions of dollars.

3. Plaintiff brings a Racketeer Influenced and Corrupt Organizations Act (RICO) claim against Southern Cross and Individual Defendants based on the pattern of defrauding Plaintiff and other individuals as part of Southern Cross's ongoing business activity.

4. Plaintiff also claims common law fraud against Southern Cross and the Individual Defendants. Specifically, beginning 2013, Pozen and Kallies in their professional capacities and in concert with Michael, Robin, and Madenberg's plan to defraud Plaintiff, materially misrepresented or failed to disclose the true value of collateral that Southern Cross owned in order to induce Plaintiff to loan Southern Cross $150,000.00 ("Loan Agreement").

5. Plaintiff further brings a breach of fiduciary duty claim against Michael, Madenberg, Pozen, and Kallies for the deliberate concealment of material information in a setting of fiduciary obligation owed to Plaintiff as a shareholder and lender to Southern Cross.

6. The predicate acts to Plaintiff's RICO claim which occurred within a 10-year time period include:

    a. multiple acts of mail and wire fraud committed by Southern Cross and all Individual defendants in the commission of the common law fraud and breach of fiduciary duty mentioned in paragraphs 4 and 5 above.

    b. The interstate transportation of funds that Southern Cross, Michael, Madenberg, and Robin obtained from Plaintiff through fraud.

7. Plaintiff also brings a RICO conspiracy claim against Southern Cross and all Individual Defendants in that all Individual Defendants agreed to conduct the affairs of Southern

Cross, each agreed to the commission of the predicate acts listed in paragraph 6 above, and that each defendant knew that those predicate acts were part of a pattern of racketeering activity.

8. Plaintiff further makes Illinois State claims for breach of lending agreement against Southern Cross, common law fraud against Southern Cross and all Individual Defendants, and finally professional negligence against Pozen and Kallies.

## JURISDICTION AND VENUE

9. This court has jurisdiction over Southern Cross and the Individual Defendants pursuant to 28 U.S.C. § 1331 and 1337 in that this case arises under federal law, specifically, the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C.S §§ 1961, 1962, and 1964). Venue is proper in the Northern District of Illinois, Eastern Division since the unlawful practices occurred within this District pursuant to 28 U.S.C. § 1391(b) and (c). There is supplemental jurisdiction over the state law claims.

## PARTIES

10. Plaintiff is an American citizen of the United States, residing in the city of St. Charles, Illinois. At relevant times, Plaintiff was an employee, lender, and investor of Southern Cross.

11. Michael A. Nasatir ("Michael") currently resides in Glenview, Illinois. Michael served as CEO of Southern Cross.

12. Robin Nasatir ("Robin") currently resides in Glenview, Illinois. Robin is Michael's wife, was a shareholder of Southern Cross, and also served as its chief operation manager.

13. Andrew L. Madenberg ("Madenberg") currently resides in Deerfield, Illinois. Madenberg served as president of Southern Cross.

14. Jeffery Pozen ("Pozen") currently resides in Lincolnshire, Illinois. Beginning in 2013, Pozen served as chief financial officer of Southern Cross.

15. Tom Kallies ("Kallies") currently resides in Milwaukee, Wisconsin. Kallies served as Southern Cross's in-house legal counsel.

## FACTS COMMON TO ALL COUNTS

16. In April 2012, Michael and Madenberg began operating Southern Cross, a corporation which they claimed engaged in developing "various energy properties" including "coal properties and related energy products".

17. Michael and Madenberg claimed to own a majority of the Southern Cross shares, either individually or jointly, which was false.

18. Further, Michael and Madenberg claimed Southern Cross owned rights to several coal mines in Kentucky including Jenny's Creek and Logan Gap worth $84 millions ("Coal Assets").

19. However, Southern Cross did not have the rights to mine any of the coal at Logan Gap and the Jenny's creek permits were either expired or set to expire within a few months.

20. Further, Michael claimed he invested over $310 million of his own assets including 2.6 million meters of nickel wire Michael claimed was valued at $87 per meter for a total of $226,200,000 ("Nickel Wire Assets").

21. However, Michael did not own or pay for the nickel wire. Instead, Michael received the nickel wire from an overseas business associate who asked Michael to sell the wire in the United States on consignment.

22. Moreover, the nickel wire was not worth nearly as much as Michael claimed. In fact, in 2009 Michael unsuccessfully tried to sell the nickel wire for $10 per meter and has been unable to sell any of the wire since then.

23. On May 31, 2013, Plaintiff became acquainted with Southern Cross and then eventually Michael and Madenberg through Southern Cross solicitors Richard Haydon McPartland, Willard St. Germain, and Allen Parres.

24. On or about April 2, 2013, Michael and Madenberg issued a press release by mail or email to Plaintiff and other individuals that Southern Cross was worth millions of dollars based upon the Coal Assets and Nickel Wire Assets, was publically on the GXG exchange regulated by the Danish Financial Supervisory Authority, and that Southern Cross had begun trading on the London Stock Exchange.

25. However, Southern Cross never applied for admission to the London stock exchange and its shares were never traded there. Further, from April 2012 to December 15, 2012, Southern Cross shares were listed on the Deutsche Borse Group securities market place, which is located in Frankfurt Germany. Finally, in April 2013, Southern Cross moved its shares to the GXG which lasted until July 2014.

26. On or about June 2, 2013, Pozen a former McGadrey auditing firm partner joined Southern Cross as its new chief financial officer (CFO).

27. Pozen presented himself to Plaintiff and other individuals as an officer of Southern Cross with experience as a CFO at other large firms.

28. With Pozen as the CFO, Plaintiff felt even more confident with Southern Cross.

29. On June 2, 2013, Parres delivered through the mail and wire systems to Plaintiff, Southern Cross's marketing materials and financial reports claiming Southern Cross was worth

5

approximately $310 million based on the Coal Mining Assets and Nickel Wire Assets ("Financial Statement").

30. The Financial Statement claimed to have been audited by the accounting firm Aronson, Gelman, and Posner and appeared to have been reviewed by the law firm ReedSmith.

31. Included in the Financial Statement was a misrepresentation that the Coal Mining Assets had been "reviewed and evaluated by an independent third party, which has used industry accepted standards to prepare a valuation of the Company's coal reserves". ("Coal Mine Valuation").

32. According to the Coal Mine Valuation, the coal mine reserves were valued at $25 million.

33. However, it was later discovered that the Coal Mine Valuation was not independent as it came from the coal mine seller and was false.

34. Further, Southern Cross' marketing materials and Financial Statement sent to Plaintiff and other individuals represented that Michael and Madenberg had invested significant sums of their own money in Southern Cross, which was false. ("Michael and Madenberg investment").

35. Moreover, other Southern Cross marketing materials mailed and emailed to Plaintiff and other individuals claimed Michael and Madenberg had "a net worth in the hundreds of millions". In fact, neither Michael nor Madenberg ever had a substantial net worth during their association with Southern Cross, and since at least 2011 Michael had been having difficulty meeting some of his monthly obligations.

36. Further, Southern Cross represented that approximately 8 million Southern Cross shares were to be held in a brokerage account in the company's name. These shares were subject

to a separate "lock-up" agreement and could not be released until April 2014. ("Lock-Up Agreement).

37. However, in March 2013, Michael directed the sale of approximately 6 million of those shares, in violation of the lock-up agreement, to two British Virgin Island companies based in China.

38. In March 2014, with the intention to secure loans for Southern Cross, Michael and Madenberg communicated these misrepresentations of the Coal Mine Asset, Nickel Wire Asset, and Coal Mine Valuation to Plaintiff and other individuals.

39. Further, Michael and Madenberg made a false promise to include a money-back guarantee provision in the agreement where the lender at any time could cancel the loan ("Money Back Guarantee").

40. Plaintiff and approximately 5 to 10 other lenders relied upon the Michael and Madenberg Investment, the Lock-Up Agreement, Coal Mine Asset, Nickle Wire Asset, Coal Mine Valuation, and the Money Back Guarantee representations backed by Pozen and Kallies when they agreed to loan Southern Cross money.

41. At least one lender, Harley Bassman, at the time Michael and Madenberg made their solicitations for loans, lived outside of Illinois in California.

42. In this respect, Michael and Madenberg's representation led Plaintiff to believe he had secured interests in $25 million worth of coal mine assets, $226 million worth of nickel wire assets, and had a money back guarantee, when in reality Plaintiff had no secured interests and no money back guarantee.

43. Plaintiff often interacted with Robin who was the chief operating officer. Robin's duties included maintaining and distributing through the use of mail or wire systems corporate

documents, files for contracts, financial records, and communicating through the use of mail or wire systems with the stock registrar.

44. On or about August 7, 2014, Kallies emailed Plaintiff a copy of the parties' $150,000.00 loan agreement ("Original Loan Agreement") which included the Money Back Guarantee.

45. Plaintiff signed the First Loan Agreement and returned the original copy to Robin.

46. Robin then claimed there were problems making a copy of the Original Loan Agreement, destroyed the Original Loan Agreement, and printed another copy for Plaintiff to sign.

47. Robin claimed the second printed copy was the same as the original, but in fact it had been changed and no longer had the Money Back Guarantee provision ("Second Loan Agreement").

48. Plaintiff believed Robin's claim that the two agreements were the same and signed the Second Loan Agreement without reading it.

49. On or about August 8, 2014, Plaintiff mailed a check for $150,000.00 to Southern Cross as part of the parties' loan agreement.

50. From September 2014 to April 2015 Southern Cross paid Plaintiff $14,333.00 towards the Loan and ceased making payments thereafter.

51. From September 2014 to December 2015 Michael and Madenberg continued to mislead Plaintiff and other individuals claiming that the Coal Mining Asset and Nickel Wire Asset would generate revenue and secure additional loans from third parties.

52. On December 7, 2015, Kallies issued a letter as in-house counsel in hopes of dissuading lenders from accelerating their loans, claiming Southern Cross had valuable assets and that Southern Cross was working to generate revenue and profits.

53. On December 21, 2015, the Security and Exchange Commission filed its complaint against Southern Cross, Michael, and Madenberg in *case no. 15 cv 11506* for securities fraud.

54. By this time, Michael, Madenberg, and Robin had spent all of Plaintiff's and other lender's money for their own benefit leaving little to no assets in Southern Cross to satisfy the loans.

55. Further, Michael and Madenberg had used the $150,000 it procured from Plaintiff through fraud to pay off third parties outside of Illinois.

56. Plaintiff relied upon the representations about the Coal Mine Asset and Nickel Wire Asset from Michael, Madenberg, Pozen, and Kallies until the SEC filed its complaint on December 21, 2015 at which point shortly thereafter Plaintiff discovered he had been defrauded.

**COUNT I**
**RICO §1962(c)**
**Against Southern Cross, Michael, Robin, Madenberg, Pozen, and Kallies**

57. Plaintiff hereby incorporates and re-alleges the allegations of paragraphs 1 through 56 as if the allegations are set forth herein.

58. This Count is against Southern Cross, Michael, Robin, Madenberg, Pozen, and Kallies ("Count I Defendants").

59. Southern Cross is an enterprise engaged in and whose activities affect interstate commerce. In this respect, Southern Cross solicited and secured loans from individuals who

resided outside of Illinois. The Count I Defendants were employed by or associated with the enterprise.

60. The Count I Defendants agreed to and did participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

a) On June 2, 2013, Michael and Madenberg transmitted through mail and wire systems false and misleading information to Plaintiff regarding the Michael and Madenberg Investment, the Lock-Up Agreement, the Coal Mining Assets and Nickel Wire Assets in a scheme to defraud Plaintiff of at least $150,000.00.

b) In February 2014, Pozen through the use of the mail and wire systems deliberately concealed or intentionally failed to disclose the true nature of the Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation in a setting of fiduciary obligation owed to Plaintiff.

c) On or about August 7, 2015, Robin transmitted through the mail and wire systems the Second Loan Agreements to Plaintiff knowing they were false or misleading to induce Plaintiff to loan Southern Cross $150,000.00.

d) From August 2014 to approximately December 2015, through the mail and wire systems Kallies deliberately concealed or failed to disclose the true nature of the Lock-out Agreement, the Michael and Madenberg Investment, Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation to prevent Plaintiff from accelerating his loan or discovering that he had been defrauded of the $150,000.00 by Southern Cross.

    e)  From August 2015 to approximately December 2015, through the mail and wiring systems Michael and Madenberg deliberately concealed or failed to disclose the true nature of the Lock-out Agreement, the Michael and Madenberg Investment, Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation to prevent Plaintiff from accelerating his loan or discover that he had been defrauded of the $150,000.00 by Southern Cross.

    f)  From August 2015 to December 2015 Michael and Madenberg transferred funds procured by defrauding Plaintiff, outside of Illinois to pay off third parties and for their own benefit.

61. Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts of mail and wire fraud and interstate transportation of improperly obtained funds.

62. The acts of mail fraud, wire fraud, and interstate transportation of improperly obtained funds listed in herin constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

63. The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

64. As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in the amount of $168,729.60 representing the defaulted loan balance with unpaid interest, and at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account from August 7, 2015 to present.

65. Wherefore, Plaintiff prays requests that this HonorableCourt enter judgment against the Count I Defendants as follows: (a) $168,729.60 loan and unpaid interest balance; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his retirement account; (c) treble damages and attorney's fees; and any relief this Honorable Court deems appropriate.

### COUNT II
### RICO §1962(d)
### Against Michael, Robin, Madenberg, and Pozen

66. Plaintiff hereby incorporates and re-alleges the allegations of paragraphs 1 through 65 as if the allegations are set forth herein.

67. This Count is against Michael, Robin, Madenberg, and Pozen ("Count II Defendants").

68. Southern Cross is an enterprise engaged in and whose activities affect interstate commerce. In this respect, Southern Cross solicited and secured loans from individuals who resided outside of Illinois.

69. As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c). Specifically:

   a. In April 2012, Michael and Madenberg agreed to operate Southern Cross as majority shareholders of the company knowing they were not majority shareholders. Michael and Madenberg agreed to communicate this false information to Plaintiff and others through the mail and wire systems with the intention of defrauding Plaintiff and others of the money loaned to Southern Cross. When making this false communication Michael and Madenberg had no

intention of using the money as promised to Plaintiff and other lenders, but instead intended to use the money for their own benefit.

b. On June 2, 2013, Michael and Madenberg agreed to transmit through mail and email false and misleading information to Plaintiff regarding the Michael and Madenberg Investment, the Lock-Up Agreement, the Coal Mining Assets and Nickel Wire Assets in a scheme to defraud Plaintiff of at least $150,000.00.

c. In February 2014, Pozen as CFO had control over information concerning the Michael and Madenberg Investment, the Lock-Up Agreement, the Coal Mining Assets and Nickel Wire Assets. Pozen has a duty to disclose the true nature of these representations to Plaintiff as a shareholder of Southern Cross. In furtherance of Michael and Madenberg's racketeering activities to defraud Plaintiff and other lenders, Pozen through the use of the mail and wire systems, deliberately concealed or failed to disclose the true nature of the Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation in a setting of fiduciary obligation owed to Plaintiff.

d. On August 7, 2019, in furtherance of Michael and Madenberg's racketeering activities to defraud Plaintiff and other lenders, Robin as chief operating officer transmitted through mail and email the Second Loan Agreements to Plaintiff knowing they were false or misleading to induce Plaintiff to loan Southern Cross $150,000.00.

e. From August 2015 to approximately December 2015, through mail or email Michael and Madenberg agreed to conceal or mislead Plaintiff and others as to the true nature of the Lock-out Agreement, the Michael and Madenberg Investment,

13

    Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation to lull Plaintiff and others into a false sense of security, so they would postpone accelerating the loans, or not suspect the racketeering activity.

  f. From August 2015 to December 2015 in furtherance of their scheme to defraud Plaintiff and other lenders, Michael and Madenberg transferred the funds fraudulently procured from Plaintiff, outside of Illinois to pay off third parties and for their own benefit.

70. The Count II Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count II Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c) in violation of 18 U.S.C. § 1962 (d).

71. As a direct and proximate result of the Count II Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiff has been injured in his business and property in the amount of $168,729.60 representing the defaulted loan balance with unpaid interest, and at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his retirement account from August 7, 2015 to current.

72. Wherefore, Plaintiff prays that this Honorable Court enter judgment against the Count I Defendants as follows: (a) $168,729.60 loan and unpaid interest balance; (b) at least

$20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) treble damages and attorney's fees; and any other relief this Honorable Court deems appropriate.

## COUNT III
## BREACH OF CONTRACT AGAINST SOUTHERN CROSS

73. Plaintiff hereby incorporates and re-alleges the allegations of paragraphs 1 through 72 as if the allegations are set forth herein.

74. On or about August 7, 2014, Southern Cross and Plaintiff executed a loan agreement for $150,000 at 16% interest to be paid back in monthly installments to Plaintiff until fully satisfied.

75. Plaintiff fully performed under the loan agreement by transferring $150,000.00 to Southern Cross.

76. Southern Cross made loan payments to Plaintiff from September 2014 to April 2015.

77. From April 2015 to present, Plaintiff demanded Southern Cross pay the loan.

78. From April 2015 to present, in breach of the loan agreement Southern Cross ceased making any payments.

79. Pursuant to the loan agreement Plaintiff is owed at least $168,729.60 plus accrued interest at 16%, costs, and fees.

80. Wherefore, Plaintiff prays that this Honorable Court enter judgment against the Count I Defendants as follows: (a) $168,729.60 loan and unpaid interest balance; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) attorney's fees and costs; and any other relief this Honorable Court deems appropriate.

## COUNT IV
## COMMON LAW FRAUD AGAINST MICHAEL AND MADENBERG

81. Plaintiff hereby incorporates and re-alleges the allegations of paragraphs 1 through 80 as if the allegations are set forth herein.

82. In April 2012, Michael and Madenberg began operating Southern Cross for the purpose of energy asset based investment and trading.

83. To induce potential investors and lenders, Michael and Madenberg made the following misrepresentations of material fact:

   a. Claiming they were a majority shareholder in Southern cross when they did not own any shares in the company;

   b. On June 2, 2013, Michael and Madenberg represented false and misleading information to Plaintiff regarding the Michael and Madenberg Investment, the Lock-Up Agreement, the Coal Mining Assets and Nickel Wire Assets in a scheme to defraud Plaintiff of at least $150,000.00.

   c. In August 2015 representing the loan agreement with Plaintiff would include a money back guarantee when they had no intention of providing it. In this respect, on or about August 7, 2015, Robin transmitted through mail and email the Second Loan Agreements to Plaintiff knowing they were false or misleading to induce Plaintiff to loan Southern Cross $150,000.00.

   d. From August 2015 to approximately December 2015, Michael and Madenberg deliberately concealed or failed to disclose the true nature of the Lock-out Agreement, the Michael and Madenberg Investment, Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation to prevent Plaintiff from

16

accelerating his loan or discover that he had been defrauded of the $150,000.00 by Southern Cross.

84. Michael and Madenberg knew these representations were false or made them in reckless disregard of their truth of falsity.

85. At the relevant time period, Michael owned a luxury mansion in which he invited Plaintiff on several occasions and claimed he was a multi millionaire, which was false.

86. Moreover, Pozen the CFO and Kallies the in house counsel lent credibility to Michael and Madenberg's claims of wealth and investment ability.

87. Given Michael's representations supported by Pozen and Kallies, Plaintiff reasonably believed Michael and Madenberg's misrepresentations.

88. The material misrepresentations listed in above induced Plaintiff to invest in Southern Cross as follows:

    e. June 6, 2013: $50,000.00

    f. January 2, 2014: $22,500.00

    g. February 14, 2014: $304,947.66

89. Moreover, on August 7, 2014, the material misrepresentations listed above induced Plaintiff to loan Southern Cross $150,000.

90. Michael, Madenberg, Pozen, and Kallies continued to conceal the fraud by misrepresenting the value of Southern Cross's assets which prevented Plaintiff from discovering the acts until the SEC filed their complaint on December 21, 2015.

91. As a proximate cause of Michael and Madenberg's material misrepresentations stated above, Plaintiff has been injured in the sum of $527,447.66.

92. Wherefore, Plaintiff prays that this Honorable Court enter judgment against the Count IV Defendants as follows: (a) $527,447.66 representing Plaintiffs investments and loans; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) attorney's fees and costs; and any other relief this Honorable Court deems appropriate.

## COUNT V
## BREACH OF FIDUCARY DUTY AGAINST
## POZEN AND KALLIES

93. Plaintiff incorporates and re-alleges every allegation set forth in paragraphs 1-92 as if the allegations are set forth herein.

94. As set forth above, Michael and Madenberg operated Southern Cross in a scheme to defraud investors and lenders including Plaintiff through a series of racketeering activity.

95. Pozen was the CFO of Southern Cross and as such owed a duty to disclose the material information to Plaintiff as a shareholder and an investor.

96. Moreover, Pozen as CFO knew or should have known the true nature of the Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation, since he was responsible for ensuring Southern Crosse's distributed financial information was reasonably accurate.

97. In February 2014, Pozen deliberately concealed or failed to disclose the true nature of the Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation in furtherance of Michael and Madenberg's scheme and in a setting of fiduciary obligation owed to Plaintiff.

98. Kallies owed a duty to Plaintiff as an attorney to present information based on reasonable due diligence as to its truth or falsity.

99. Kallies knew or should have known the true nature of the Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation, since he was responsible for ensuring Southern Crosse's distributed financial information was reasonably accurate.

100. From August 2015 to approximately December 2015, Kallies deliberately concealed or failed to disclose the true nature of the Lock-out Agreement, the Michael and Madenberg Investment, Coal Mining Assets, Nickel Wire Assets, and Independent Coal Valuation to prevent Plaintiff from accelerating his loan or discover that he had been defrauded of the $150,000.00 by Southern Cross.

101. As a proximate result of Pozen's and Kallies' acts Plaintiff has been damaged in the amount of $527,447.66, which is a total of all investments and loans made to Southern Cross.

102. Wherefore, Plaintiff prays that this Honorable Court enter judgment against the Count IV Defendants as follows: (a) $527,447.66 representing Plaintiffs investments and loans; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) attorneys fees and costs; and any other relief this Honorable Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that, after trial by jury, this Honorable Court grant him relief as follows:

A. For RICO violations award Plaintiff (a) $168,729.60 loan and unpaid interest balance; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) treble damages; (d) attorney's fees and costs;

B. For Breach of Contract $150,000 plus all accrued interests, $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account;

19

    C. For common law fraud: (a) $527,447.66 representing Plaintiffs investments and loans; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; (c) punitive damages; (d) attorney's fees and costs.

    D. For Breach of Fiduciary Duty : (a) $527,447.66 representing Plaintiffs investments and loans; (b) at least $20,000 in lost gains Plaintiff would have earned had the $150,000 remained in his investment account; and (c) attorneys fees and costs

    E. Award pre-judgment and post-judgment interest as provided by law; and

    F. Award such other relief as this Court deems just and appropriate.

    SHAW LEGAL SERVICES LTD.,

    By: /s/ Caryn I. Shaw
    One of its Attorneys

SHAW LEGAL SERVICES, LTD
Caryn I. Shaw
540 W. Briar Ste B
Chicago, IL 60657
(773) 549-9500
(773) 549-9503
Attorney no: 6315737